IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| RAMASWAMY RAVIKUMAR, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CAUSE NO. 2:23-cv-00560 |
| | § | |
| MEMORIAL HEALTH SYSTEM OF | § | |
| EAST TEXAS D/B/A CHI ST. LUKE'S | § | |
| HEALTH MEMORIAL HOSPITAL | § | |
| LUFKIN, BAYLOR ST. LUKE'S | § | |
| MEDICAL GROUP ("BSLMG"), | § | |
| COMMONSPIRIT HEALTH, | § | |
| DAVID BAILEY, M.D., | § | |
| HUNT HUBER, M.D., KAYWIN | § | |
| CARTER, M.D., AND PRASHANT | § | |
| KUMAR, M.D. | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF RAMASWAMY RAVIKUMAR, M.D.'S ORIGINAL COMPLAINT,
INCLUDING FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Ramaswamy Ravikumar, M.D. ("Dr. Ravikumar") files this Original Complaint

against Defendants Memorial Health System of East Texas d/b/a CHI St. Luke's Health Memorial

Lufkin (the "Hospital"), Baylor St. Luke's Medical Group "BSLMG," David Bailey, M.D. ("Dr.

Bailey"), CommonSpirit Health, Hunt Huber, M.D. ("Dr. Huber"), Kaywin Carter, M.D. ("Dr.

Carter"), and Prashant Kumar, M.D. ("Dr. Kumar"), (collectively "Defendants"). Dr. Ravikumar

respectfully requests that this Court hold Defendants jointly accountable for their collective,

unlawful actions and that he recover his damages as set forth below:

## I.     PARTIES

1.      Plaintiff Dr. Ravikumar is a resident and citizen of Angelina County, Texas.

2.      Defendant Memorial Health System of East Texas d/b/a CHI St. Luke's Health Memorial Lufkin is a non-profit corporation organized under the laws of the State of Texas with its principal place of business in Lufkin, Texas.  Defendant may be served by serving its registered agent for service of process, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

3.      Defendant Baylor St. Luke's Medical Group ("BSLMG") is a non-profit corporation organized under the laws of the State of Texas with its principal place of business in Houston, Texas. Defendant may be served by serving its registered agent for service of process, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4.      Defendant CommonSpirit Health is a foreign non-profit corporation with its principal place of business in Englewood, Colorado and registered with the Texas Secretary of State.  CT Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201, is its registered agent for service of process.

5.      Defendant David Bailey, M.D. is a resident and citizen of Angelina County, Texas. Defendant Dr. Bailey was the Chief Medical Officer for St. Luke's Health Memorial – Lufkin until September 19, 2022, and an agent of the Hospital. He may be served at 506 Card Drive, Lufkin, Texas 75901 or wherever he may be found.

6.      Defendant Hunt Huber, M.D. is a resident and citizen of Angelina County, Texas. Defendant Dr. Huber was previously the Chief of Staff of St. Luke's Health Memorial – Lufkin. He remains a Member of the Board of Directors of the Hospital, the Chairman of the Quality Committee, and an agent of the Hospital. He may be served at 108 Sand Hills Drive, Lufkin, TX 75901 or wherever he may be found.

7.     Defendant Kaywin Carter, M.D. is a resident and citizen of Angelina County, Texas.  Defendant Dr. Carter became the Chief Medical Officer for St. Luke's Health Memorial – Lufkin effective September 19, 2022. She is an agent of the Hospital.  Defendant Dr. Carter may be served at 910 Champions Drive, Lufkin, Texas 75901 or wherever she may be found.

8.     Defendant Prashant Kumar, M.D. is a resident and citizen of Angelina County, Texas.  Defendant Dr. Kumar is Chief of Staff of St. Luke's Health Memorial, Member of the Board of Directors of the Hospital, and an agent of the hospital. He may be served at 1904 Lobolly Lane, Lufkin, TX 75904 or wherever he may be found.

## II.     VENUE AND JURISDICTION

9.     Venue is proper in this district under 28 U.S. Code § 1391 because a substantial part of the events and/or omissions giving rise to this Complaint occurred in this district.

10.     This Court has jurisdiction pursuant to the following statutes:

a.     28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States;

b.     28 U.S.C. § 1343, which gives district courts jurisdiction over actions to secure civil rights extended by the United States government; and

c.     28 U.S.C. § 1367, which gives the district court supplemental jurisdiction over state law claims.

## III.     BACKGROUND FACTS

11.     Dr. Ravikumar brings this action against CommonSpirit Health, CHI St. Luke's Memorial Lufkin (the "Hospital"), Baylor St. Luke's Medical Group ("BSLMG"), David Bailey, M.D., Hunt Huber, M.D., Kaywin Carter, M.D., and Prashant Kumar, M.D. (collectively "Defendants"). Beginning in April of 2022, Defendants instigated and carried out an unreasonable,

discriminatory, anti-competitive, arbitrary, and capricious peer review investigation that failed to comply with the Health Care Quality Improvement Act ("HCQIA").  Defendants designed and instituted this plan to remove Dr. Ravikumar as a cardiovascular and thoracic surgeon in Lufkin, Texas.

12.     After months of recruitment by CommonSpirit Health, the Hospital, and BSLMG, Dr. Ravikumar agreed to join the Memorial Lufkin medical staff in December of 2020. When Dr. Ravikumar did not make the Hospital enough money, Defendants punished him for reasonably advocating for patient care, subjected him to an unjust and prolonged peer review, and terminated his Professional Services Agreement ("PSA" or "contract").  After Dr. Ravikumar lost his job on January 4, 2023, the Hospital and its Medical Executive Committee ("MEC") imposed a summary suspension and a preoperative concurring consultation requirement on Dr. Ravikumar's then-useless privileges on February 23, 2023. Thirty nine (39) days later, the Hospital filed an adverse report of Dr. Ravikumar with the National Practitioner Data Bank ("NPDB" or "Data Bank") disclosing the consultation requirement and publishing to the Data Bank that there were "quality of care concerns" related to four surgical cases involving Dr. Ravikumar. The Hospital subsequently filed three additional false reports to the Data Bank.

13.     Following the Hospital's third adverse report to the NPDB, the Texas Medical Board became aware through the Data Bank of the Hospital's adverse reports and initiated a formal investigation of Dr. Ravikumar's conduct. Since January 4, 2023 of this year, Dr. Ravikumar has been unable to find work as a cardiac surgeon.

14.     Dr. Ravikumar brings this lawsuit to shed light on the devastating costs that arise when corporations practice medicine, place profits above their physicians and patients, and use

racially motivated discriminatory practices to oust physicians they no longer want at their hospitals.

### Defendants and HIET Recruit Dr. Ravikumar to Lufkin, Texas

15.     Ramaswamy Ravikumar, M.D. is an experienced, board-certified cardiovascular and thoracic surgeon.  Since the start of his medical career in 1981, Dr. Ravikumar has built an exemplary reputation for quality patient care, technical excellence, and outstanding professionalism in cardiothoracic surgery. Dr. Ravikumar's skills and specialized abilities for patients requiring cardiothoracic surgeries, from conventional open-heart surgery to advanced robotic-assisted surgical procedures, allowed him to grow his practice and professional reputation with referrals from medical professionals aware of his well-deserved reputation for outstanding patient care. Dr. Ravikumar established his reputation as a pioneer of robotic heart surgery, performing the World's first robotic double valve replacement and the World's first robotic combined mitral valve replacement and coronary artery bypass graft in 2011. He performed India's first robotic aortic valve replacement in 2010 and India's first robotic mitral valve replacement in 2006. His achievements and dedication led Dr. Ravikumar to become a highly sought-after cardiothoracic surgeon.

16.     In 2020, Dr. Ravikumar sought to expand his practice to Lufkin, Texas.  A prominent east Texas cardiologist, Ravinder Bachireddy, M.D., knew Dr. Ravikumar and was instrumental in recruiting him to Memorial Lufkin. Since 1982, Dr. Bachireddy has been the Co-Founder and President of The Heart Institute of East Texas, PA ("HIET").[1]  He is the Chief of Cardiology at Memorial Medical Center/CHI St Luke's Health-Memorial and runs the Hospital's Cardiovascular Service Line through a Management Services Agreement ("MSA") with the

---

[1] THE HEART INSTITUTE OF EAST TEXAS, P.A., https://www.hiet.com/about-us/ (last visited November 26, 2023).

Hospital.  Dr. Bachireddy and HIET pride themselves on serving "an integral role in establishing top-rated heart-care programs at both Memorial Medical Center / CHI St. Luke's Health Memorial Lufkin and Woodland Heights Medical Center. The development of these programs has been very successful, and were instrumental in making Lufkin the hub of cardiology care in Deep East Texas."[2]

17.     Dr. Bachireddy and his partners at HIET needed a cardiothoracic surgeon of Dr. Ravikumar's caliber to operate on their patients who needed surgical intervention. There was a high demand in the East Texas community for a surgeon who could perform high-risk cardiac cases. This would allow them to keep their patients in East Texas under the "same roof" rather than transferring these high-risk patients to other facilities.  As such, Dr. Bachireddy was instrumental in bringing Dr. Ravikumar to Lufkin, Texas.  In or around July of 2020, Dr. Ravikumar began performing *locum tenens*[3] work at the hospital. He quickly demonstrated his surgical and professional excellence to the cardiologists at HIET and Memorial Lufkin.

### Dr. Ravikumar Signs a Professional Services Agreement with BSLMG

18.     In November of 2020, the Hospital's CEO, Monte Bostwick, offered Dr. Ravikumar a permanent position.  Mr. Bostwick handled all negotiations concerning the Professional Services Agreement (PSA) with Dr. Ravikumar.  During these conversations and negotiations, Dr. Ravikumar made it clear that he wanted to focus his practice on cardiac surgery. While Dr. Ravikumar would be available to assist the Hospital's cardiologists who encountered surgical emergencies with stenting patients for peripheral vascular surgery, Dr. Ravikumar's true

---

[2] *Id.*
[3] *Locum tenens* is defined as "one filling an office for a time or temporarily taking the place of another —used especially of a doctor or clergyman". Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/locum%20tenens.

specialty was in the area of cardiac surgery.  It did not involve Dan Watson, Memorial Lufkin's

Market Vice President of Physician Enterprise[4] and Vice President of Operations for BSLMG.

19.    The parties memorialized their agreement on December 3, 2020, when Dr.

Ravikumar signed the PSA with Baylor St. Luke's Medical Group ("BSLMG").[5]  The agreement

entitled Dr. Ravikumar to a set annual compensation for the first three years, regardless of

wRVUs.[6] In other words, the Hospital did not tie Dr. Ravikumar's compensation to his production.

The agreement was for a period of five years, but also listed many ways BSLMG could terminate

the contract, ranging from immediate termination to termination without cause with 180 days'

written notice.  The Hospital made this arrangement because Dr. Ravikumar's highly-specialized

skills were needed to rejuvenate the cardiothoracic surgery program, which had fallen into tatters

in the past two-and-a-half years before his employment. Prior to the hiring of Dr. Ravikumar, the

Hospital was constantly bringing in cardiothoracic surgeons on *locum tenens* rotations to fill this

gap.

20.    To establish the Hospital's cardiovascular service line (CVSL) and cardiac surgery

program, BSLMG and the Hospital requested Dr. Ravikumar to go through the credentialing

processes at both Memorial Lufkin and Woodland Heights Medical Center. Dr. Ravikumar applied

to join the Memorial Lufkin Medical Staff and obtained active staff privileges.  Dr. Ravikumar

---

[4] "As St. Luke's Health-Memorial's Market Vice President of Physician Enterprises, Dan Watson's primary responsibilities include overseeing the growth and development of Baylor St. Luke's Medical Group (formerly Memorial Clinics), physician recruitment, and seeking additional opportunities to grow with our physician partners." ST. LUKES HEALTH, https://www.stlukeshealth.org/locations/memorial-lufkin-hospital/about-us/leadership
 (last visited November 27, 2023).
[5] Effective May 1, 2021, the parties signed a First Amendment to the Professional Services Agreement by and between BSLMG and Dr. Ravikumar. They amended the PSA to change the legal name of the contracting entity from Ramaswamy Ravikumar, M.D. to Dr. R. Ravikumar, M.D., Inc. The parties agreed that all services under the PSA, as amended, shall be provided personally by Texas licensed physician Ramaswamy Ravikumar, M.D.
[6] A "wRVU" is a standard unit of measurement used to establish value for common health care procedures. Simply put, a wRVU is a number assigned to every codable direct patient care experience. In production-based compensation plans, you are expected to generate a set number of wRVUs (your wRVU threshold).

participated in cardiothoracic surgery call at Lufkin pursuant to his PSA (sometimes referred to as "on call" contracts).

### *Dr. Ravikumar Expresses His Concerns about Patient Care to the Hospital*

21.     Even before signing the original PSA, Dr. Ravikumar raised concerns about the need for equipment and key personnel in order to make the CVSL at the Hospital successful.  Mr. Bostwick assured Dr. Ravikumar these concerns would be addressed. After signing the PSA in December of 2020, Dr. Ravikumar quickly began seeing patients and set to work in developing the hospital's cardiac surgery program. As time went on, Dr. Ravikumar became increasingly concerned about patient care issues at the hospital.  These concerns included understaffing of qualified, full-time nurses in the hospital's OR, intensive care unit (ICU), general care units and emergency room; a shortage of mid-level providers; the lack of a full-time board certified cardiac anesthesiologist with transesophageal echocardiography (TEE) certification; the lack of consistent procedural safeguards for monitoring patients; and the failure to update critical equipment. These issues were further exacerbated by the COVID-19 pandemic.

22.     On October 11, 2021, Dr. Bachireddy wrote a letter to top administrators at the Hospital and BSLMG outlining these issues:

> Since Dr. RaviKumar joined in December 2020 the scores around quality and health outcomes have improved. While his onboarding occurred 10 months ago, it wasn't until May that he was given an office, which still does not have a front office clerk, nurse and 1st assist. A nurse was just hired by BSLMG but without Dr. RaviKumar's input or prior interview. Even the Chief of Staff told the administration, in a recent meeting, that this was an insult to Dr. RaviKumar. Mr. Dan Watson, VP of Operations BSLMG, had the responsibility of preparing Dr. RaviKumar's office and having it adequately staffed. Despite reminding Mr. Watson month after month in MHI/MSA Executive meetings these issues are not resolved. In the same period HIET has recruited two cardiologists and both had fully trained staff from day one.
>
> St. Luke's Health Memorial Hospital - Lufkin does not have a Board-Certified Cardiovascular Anesthesiologist with TEE certification. In May/June 2021 the

Cardiologists and CV Surgeon brought this requirement to the St. Luke's Health Memorial Hospital – Lufkin Administration's attention in order to safely operate on complex CABGs and valve cases. It is unclear to the physicians of HIET as to why the current hospital administration does not share the same vision for the CVSL. Despite our repeated efforts there is still a lack of action to resolve CVSL issues – support staff for the CV Surgeon and hiring a CV Boarded Anesthesiologist with TEE Certification. In the better interest of patient safety and outcomes the CV surgery program is put on hold, except for emergencies, until these basic requirements have been met. These requests have been strongly supported by St Luke's Health Memorial Hospital Chief of Staff, Dr. Kaywin

Carter as well as Dr. Falluji, System Physician VP – Director CVSL CommonSpirit Health, and Dr. Plana Gomez, Baylor College of Medicine Chair of Cardiology, during a July 2021 MSA CVSL meeting.

The Cardiologists of HIET have no personal or financial gain by the fulfillment of these requests. Patient safety and good health outcomes are our main priority. We appreciate your time and commitment to resolve these concerns. HIET will continue to be a true partner in the success of CSH and each of its entities.

23.      Even before signing the PSA, Dr. Ravikumar requested the Hospital to purchase an ECMO machine[7] to allow their program to assist their high-risk cardiac patients.  In November of 2021, Dr. Ravikumar requested the hospital obtain an ECMO machine in writing. Despite repeated requests, the Hospital failed to procedure an ECMO machine.  This failure by the Hospital  is a crucial fact in the peer review investigation that later transpired against Dr. Ravikumar.

24.      Dr. Ravikumar began experiencing these circumstances first-hand when he had two patients experience unexpected events while being cared for in the hospital after undergoing surgical procedures in March of 2022.

### *Defendants Create a Scheme to Dispose of Dr. Ravikumar*

25.      Despite all of these obstacles, Dr. Ravikumar still provided excellent results for the cardiac surgery program at the Hospital.  The Society of Thoracic Surgeons ("STS") publishes

---

[7] "ECMO" stands for extracorporeal membrane oxygenation. The ECMO machine is similar to the heart-lung by-pass machine used in open-heart surgery. It pumps and oxygenates a patient's blood outside the body, allowing the heart and lungs to rest.

nationwide statistics about morbidity, morality, and complication rates. Dr. Ravikumar's results surpassed the regional and national expected numbers.

26.     The Hospital's problem was not with Dr. Ravikumar's patient care. Rather, the problem was the Hospital's bottom line. Dr. Ravikumar had made it clear he was primarily a cardiac surgeon. Mr. Bostwick agreed to a non-production based financial arrangement with Dr. Ravikumar.  Due to no fault of his own, the number of cardiac surgery cases Dr. Ravikumar had performed in the first year of his contract did not cover his base compensation.  This is because Dr. Ravikumar was rebuilding a near-defunct program due to the use of *locum tenens* surgeons rather than a permanent surgeon with a good performance record.  In addition, in order to increase the revenue of the program, the Hospital would need to spend even more money on the cardiovascular service line (CVSL) to obtain the necessary equipment, a fulltime cardiac anesthesiologist, and fulltime staff. The Hospital decided this did not make economic sense, despite the benefit that the East Texas community would have derived from this improved cardiac surgery service.

27.     In response to Dr. Ravikumar and the cardiologists repeatedly speaking out about concerns with the CVSL program, requesting more resources and equipment and staff, and the negative financial impact Dr. Ravikumar's PSA contract had on the Hospital, Dr. Ravikumar became the subject of excessive and unwarranted scrutiny. The Hospital was stuck with the contract for the next three years and they needed a way out.  For these reasons, Defendants joined in a calculated and deliberate scheme to get rid of Dr. Ravikumar sooner. Rather than simply terminate him not for cause with 180-days' notice (which Dr. Ravikumar acknowledges they had

the right to do), the Hospital chose to get rid of Dr. Ravikumar by undermining his reputation and ability to practice medicine through a sham peer review.[8]

28.     Finding key medical staff members who wished to harm Dr. Ravikumar's reputation and career was easy.  Not all physicians at Memorial Lufkin were pleased about Dr. Ravikumar's arrival at the Hospital.  Defendant David Bailey, M.D., who was the Chief Medical Officer for the Hospital, was opposed to Dr. Ravikumar from the outset.  He consistently voiced disparaging and slanderous remarks about Dr. Ravikumar.  In fact, when Dr. Ravikumar learned about these remarks, he requested a meeting with Monte Bostwick and Dr. Bailey. Dr. Ravikumar communicated that he wanted to work in a safe, healthy, and unthreatening work environment. Later, in a meeting with the hospital administration and members of the CVSL, Dr. Bailey publicly apologized to Dr. Ravikumar for the remarks.

29.     Another medical staff member and Chair of the Quality Committee, Michael Hunt Huber, M.D., had also made disparaging remarks about Dr. Ravikumar. As the Chair of the Quality Committee, Dr. Huber is charged with reviewing data to make recommendations for patient safety and care.  Yet Dr. Huber told the medical staff that he "didn't care about statistics" regarding Dr. Ravikumar's excellent patient results.   Dr. Huber also made personal and discriminatory disparaging remarks about Dr. Ravikumar.  In talking to a peer, Dr. Huber used expletives about Dr. Ravikumar and Dr. Bachireddy, calling them the "Indian Mafia."  He also said, "Bachireddy has been running this place for 40 years and now Ravi comes in. Because of these guys in the Indian mafia, my wife Cindi lost her job."[9]

---

[8] Roland Chalifoux, Jr., DO, "So What Is a Sham Peer Review?", National Library of Medicine, MedGenMed. 2005; 7(4): 47, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1681729/.

[9] Cindi Huber, CPHRM, CPCS was the risk manager at CHI St. Luke's from August 2002 to June 2022; she is now the risk manager at Nacogdoches Memorial Health.

30.     The Hospital knew both Dr. Bailey and Dr. Huber had a history of discriminatory behavior against non-white physicians. Dr. Frank Walker, an African-American surgeon, who previously worked at the Hospital, sued all three Defendants in this very same Court six years ago.[10]  Dr. Walker alleged that "Defendants intentionally deprived Dr. Walker of the same rights as are enjoyed by white citizens in the creation, performance, enjoyment, and all benefits and privileges of his contractual relationship with Memorial Lufkin and CHI St. Luke's Health Memorial Livingston, in violation of 42 U.S.C. §1981."[11]

31.     The appropriate way for any health care provider to attract patients in a competitive market is by providing and being known for providing the highest quality of care.  The illegal and unjust way (putting patients and their free choice in the market in jeopardy) is to malign, spread untrue or misleading information, or otherwise smear the reputation of a highly qualified surgeon in the same medical community.  Unfortunately, this is exactly what Defendants did.  Defendants arrogantly believed they could hide their wrongdoing behind the Healthcare Quality Improvement Act (HCQIA), which gives immunity to hospitals and reviewers participating in peer review.

### *Defendants Begin the Sham Peer Review against Dr. Ravikumar*

32.     Quality patient care is the most important goal of any legitimate health care provider.  Under both federal and state law, hospitals and their medical staff are required to follow strict standards for peer review evaluation and monitoring.  These peer review standards rely upon a consistent and well-developed process to ensure that favoritism, improper motives, and manipulation for unjust purposes play no role. The Hospital had such a process in place at all relevant times, but Defendants acted to evade and avoid its safeguards while manipulating the rules

---

[10] *See* Plaintiff's Original Complaint in *Walker v. Memorial Health System of East Texas d/b/a CHI St. Luke's Health Memorial Lufkin, David Bailey, M.D. and Hunt Huber, M.D.*; Civil Action No. 2:17-CV-00066-JRG; In the United States District Court for the Eastern District of Texas Marshall Division.
[11] *Id.* at *11.

for peer review and utilization review for their own wrongful purposes. Rather than comply with the medical peer review process and its safeguards against improper influence, Defendants attempted to evade these well-established protocols and the standing medical peer review committee at the hospital.

33.     Beginning in April of 2022, Defendants commenced a peer review investigation of Dr. Ravikumar, ostensibly based upon "concerns" regarding the two complex patients Dr. Ravikumar cared for in March. The patients were identified as medical records #0101006515 and #0101008112, for dates March 28, 2022 and March 30, 2022.  The evidence will show, however, that neither case—nor the other two cases that were ultimately reviewed by Defendants—presented facts upon which adverse recommendations could reasonably be based. All four cases involved well-known, post-surgery complications that can arise in cardiac surgery patients. The complications were not the result of Dr. Ravikumar's actions, but rather occurrences that can happen with any patient depending upon the circumstances and the risk factors. Dr. Ravikumar discussed these potential complications with the patients before each surgery.

34.     In April of 2022, Dr. Ravikumar received a call from Dr. Bailey and Dr. Preshant Kumar, Chief of Staff at Memorial Lufkin. During this call, Dr. Bailey told Dr. Ravikumar that reports had been made that he [Dr. Ravikumar] "left the OR and that this violated the hospital's bylaws."  Dr. Ravikumar was shocked by this conversation. He asked whether he was being accused of violating any hospital bylaws; they responded that they "didn't know."

35.     On April 26, 2022, Dr. Ravikumar wrote to the hospital, requesting that the MEC recuse Dr. Bailey and another internal medicine doctor, Karen Allen, DO, from participating in the peer review process due to their personal biases. Specifically, we wrote the following regarding Dr. Bailey:

**Interactions and conflict of interest with Dr. Bailey chief medical officer**

Dr. Bailey has never been helpful in assisting with overcoming some of the obstacles that I have faced in running the cardiothoracic surgery program in our hospital.

One of the earliest interactions was his message to me whereby he was trying to restrict my scope of practice by suggesting that do not do valve surgery when I have privileges granted by credentials committee. This [in spite of] my excellent results in valve surgery.

Examples of this include his inability to obtain a redo oscillating saw for a patient who was unfortunately transferred to Houston.

There was another patient on the OR able when the endoscopic vein harvesting system was not functioning properly. When we requested that he assist us with replacing or fixing the equipment, he was not able to provide the assistance that we required and requested. During the first 6 months I was given a FSA( surgical first assistant) who was suboptimal in harvesting the vein, my repeated requests to Dr Bailey to hire a new FSA fell on dead ears.T he good vein for CABG is most fundamental for graft latency.

He has also been spreading disparaging remarks to my peers about me. I had sent a message to him in October of last year requesting that he cease doing this. He openly apologized to me in a meeting and said he would stop. My peers have told me that he has continued making false statements and has continued spreading rumors injuring my professional reputation and adversely reflecting on my fitness to practice medicine in this hospital.

Initially Dr. Bailey's wife, Kim, was appointed my office manager. Dr. Carter felt this posed significant conflict of interest and she therefore removed her from the position of office manager.

When we reported concerns about the clinical judgment of one of the hospitalist, he was very biased.

> As Chief Medical Officer I do not believe he should be
> inquiring or directing others to inquire on his behalf about me
> by means of questioning and interviewing the
> staff. He began doing this about three months ago. I brought
> it to the attention of the management at that time.
> Investigation of physicians falls in the realm of the MEC, not
> the CMO.
>
> Regards
>
> Dr R Ravikumar MD FRCS
> Sent from my iPhone

Despite Dr. Ravikumar's requests, the Hospital never told him whether these individuals continued to participate in the peer review.

36.     On April 27, 2022, Chief of Staff Dr. Preshant Kumar, Dr. Kevin Hudson, Vice Chairman of Medical Staff, Dr. Hamaker, head of department of surgery, and Nanika Lockhart, Medical Affairs Coordinator at CHI, met with Dr. Ravikumar. At this meeting, Dr. Ravikumar was falsely accused of violating the hospital bylaws by leaving the OR. There is nothing in the bylaws about the conduct of an operation. (The reasons for which are stated in the next paragraph.) The Hospital representatives falsely accused him of violating the bylaws while knowing that the bylaws have no such requirement. After a discussion on this point, the Hospital representatives simply said, "Whenever you leave the OR, just let them know."  This statement was unnecessary as this is Dr. Ravikumar's standard practice.

37.     On May 5, 2022, Dr. Ravikumar and his competitor, cardiothoracic surgeon David Sees, M.D., sent the following email to Dr. Kumar, Dr. Bachireddy, and the members of the MEC and other hospital committees:

> We are writing this communication to the Chief of Staff, members
> of the MEC and other hospital committees because there seems to be
> some confusion about presence of surgeon in the operating room for
> cardiac surgery. Both of us are board-certified in Cardiothoracic
> Surgery and our combined experience of practicing cardiac surgery is

more than 75 years. We have been Chairman of Cardiac Surgery departments in other hospitals, program directors of cardiac surgery and have successfully managed programs with good results. This communication is also based on our interactions with other cardiac surgeons who are leaders in their hospitals. We follow the guidelines of the American College of surgeons for Conduct of Operation and Perioperative care Published in 2016. Please see below:

[AMERICAN COLLEGE
OF SURGEONS
STATEMENTS
Statements on Principles
April 12, 2016
D. The Operation—Intraoperative Responsibility of the Primary Surgeon
General Statement

The primary attending surgeon is personally responsible for the patient's welfare throughout the operation. In general, the patient's primary attending surgeon should be in the operating suite or should be immediately available for the entire surgical procedure. There are instances consistent with good patient care that are valid exceptions.

Procedure-Related Tasks
A primary attending surgeon may have to leave the operating room for a procedure-related task, such as review of pertinent pathology ("frozen section") and diagnostic imaging, discussion with the patient's family, and breaks during long procedures. The surgeon must be immediately available for recall during such absences.

The definitions at the end of this Statement provide essential clarification for terms used herein.

"Primary attending surgeon"
Considered the surgical attending of record or the principal surgeon involved in a specific operation. In addition to his or her technical and clinical responsibilities, the primary surgeon is responsible for the orchestration and progress of a procedure
"Critical" or "key" portions of an operation"
The "critical" or "key" portions of an operation are those stages when essential technical expertise and surgical

judgment are necessary to achieve an optimal patient outcome. The critical or key portions of an operation are determined by the primary attending surgeon.
"Immediately available"
Reachable through a paging system or other electronic means, and able to return immediately to the operating room.

"Delegation to Qualified Practitioners"
The surgeon may delegate part of the operation to qualified practitioners including but not limited to residents, fellows, anesthesiologists, nurses, physician assistants, nurse practitioners, surgical assistants, or another attending under his or her personal direction. However, the primary attending surgeon's personal responsibility cannot be delegated. The surgeon must be an active participant throughout the key or critical components of the operation. The overriding goal is the assurance of patient safety.

"Qualified practitioner"
Any licensed practitioner with sufficient training to conduct a delegated portion of a procedure without the need for more experienced supervision and who is approved by the hospital for these operative or patient care responsibilities.]

Almost none of the physicians on the Committees of the hospital, have been inside heart surgery operating rooms. Unfortunately, the members of some of the committees are formulating these rules and bylaws without information and in-depth knowledge of the Cardiothoracic operations. We are not members of any of these committees. We respectfully request the Chief of Staff to include both of us in any rules and bylaws made about conduct of Cardiothoracic surgery.

Thank you for your consideration,

Sincerely

Dr David Sees MD
Dr Ramaswamy Ravikumar MD FRCS

38.     Two Caucasian cardiothoracic surgeons, Dr. Sees and Dr. DeWalt, were caring for

the patient cases under peer review but were never investigated by the MEC concerning their

involvement. These doctors were in charge of the patients' care when concerns were raised in the peer review process by the Hospital's external reviewers. Moreover, their involvement was not reviewed despite Dr. Ravikumar raising this issue for the Hospital and the MEC. This inaction by the Hospital and MEC demonstrates discrimination and bias against Dr. Ravikumar.

39.     In or around June of 2022, these two cases were reviewed in the cardiology and cardiothoracic surgery morbidity and mortality meeting with all of the cardiologists at HIET, Dr. Ravikumar, and his competitor, cardiothoracic surgeon David Sees, M.D.  During this meeting, all of the physicians concluded that Dr. Ravikumar met the standard of care.

40.     Based on information and belief, these two cases were also investigated by the Centers for Medicare & Medicaid Services (CMS), who also independently found no violations in the standard of care or wrongdoing with respect to these two patients.

***The Hospital Creates an "Ad Hoc Committee"***

41.     On September 16, 2022, the MEC considered a request for corrective action concerning two of Dr. Ravikumar's surgical cases.  On September 20, 2022, Dr. Preshant Kumar, on behalf of the MEC, sent a letter to Dr. Ravikumar stating, "Upon review and consideration of the issues, the MEC determined that an Investigation is warranted and appointed an ad hoc committee to conduct the Investigation. As Chair of the MEC and in accordance with the Bylaws, this letter shall constitute your Notice under Article VII Section 1-3 that an Investigation has begun." Dr. Kumar wrote, "The investigating body shall make a reasonable effort to complete its Investigation and issue its report within forty-five (45) days of the initiation of its Investigation." A copy of this letter was sent to Defendant Dr. Carter, who was the Chief Medical Officer at the Hospital.  As the CMO and administrator of the Hospital, Dr. Carter reports directly to Monte Bostwick, the CEO of the Hospital.  Thus, the Hospital was fully aware of the MEC actions.

42.     This investigation concerned the two cases Dr. Ravikumar performed in March of 2022.  Why the MEC decided to wait until September of 2022, **nearly six months afterwards,** to begin an "Investigation" makes no sense, especially since the cardiothoracic and cardiovascular morbidity and mortality committee and CMS found no violations of the standard of care concerning these two patients.

43.     Unbeknownst to Dr. Ravikumar, the Hospital had already sent the cases for outside review by Chartis Clinical Quality Solutions (formerly known as The Greely Company).[12]  Based on the date of the Chartis report (which Dr. Ravikumar did not receive until May 2023), the reports were prepared on August 22, 2022.  In doing so, the Hospital had commissioned an outside review with pre-arranged outcomes that reflected their desired outcome. However, Dr. Kumar made no mention of this in his September 2022 letter. Again, if the purpose of this review was to improve quality of care, the Hospital would have shared the findings in the reports with Dr. Ravikumar. Instead, they remained silent.

44.     Contrary to Dr. Kumar's letter, the MEC then began reviewing every surgical case performed by Dr. Ravikumar since he arrived in Lufkin.  During his time in Lufkin, Dr. Ravikumar performed a total of 143 surgeries.  When they could not find any problems with patient care, the MEC decided to bide its time and wait to setup Dr. Ravikumar. Eventually, they singled out two additional cases: Patient #3 and Patient #4, for care that occurred on October 12, 2022 and November 15, 2022. Unbeknownst to Dr. Ravikumar, the Hospital then sent these two cases to a different external review company called NorthGauge Healthcare Advisors.[13]

---

[12] Chartis Clinical Quality Solutions (formerly known as The Greely Company) is an outside company that performs external peer review services on behalf of hospitals. See https://www.chartisquality.com/campaigns/external-peer-review

[13] "About Us", NorthGauge Healthcare Advisors, available at https://www.nghca.com/about-us/ (last visited November 29, 2023).

***BSLMG Terminates Dr. Ravikumar's Contract - Without Cause***

45.      On January 4, 2023, Dan Watson, Vice President of Operations for BSLMG, sent Dr. Ravikumar written notice of the termination of the Professional Services Agreement ("PSA") by and between Baylor St. Luke's Medical Group ("BSLMG") and Ramaswamy Ravikumar, M.D. The Agreement, with an effective date of December 3, 2020, provided in part for termination **without cause** at any time upon the occurrence of one hundred eighty (180) days written notice by BSLMG.  Accordingly, with this notice by BSLMG, Dr. Ravikumar's Agreement terminated effective one hundred eighty days (180) from the date of the January 4, 2023 letter. Effective immediately, Dr. Ravikumar was relieved from all further clinic and hospital duties under the Agreement, including but not limited to providing onsite clinical services at his clinic and onsite clinical and or surgical services at St. Luke's Health Memorial Lufkin.

46.      Pursuant to the Notices Section 8.4 of the parties' PSA, BSLMG was required to provide this notice of termination to CHI St. Luke's Health Office of the General Counsel.  As such, both BSLMG and the Hospital were aware Dr. Ravikumar was unable to see or admit patients at St. Luke's Health Memorial Lufkin effective January 4, 2023.

***The Peer Review "Investigation" Continues***

47.      After the BSLMG termination letter was delivered on January 4, 2023, the Hospital had simultaneously closed Dr. Ravikumar's clinic and re-assigned his APRN.  Dr. Ravikumar thus had no practice and had no patients.  The Hospital had relieved him of all further clinical and surgical duties. In fact, if Dr. Ravikumar was to see a patient after this date, he would be in breach of his PSA and the terms of the BSLMG termination letter. The Hospital, BLSMG, and the MEC were well aware of this. None of the cardiologists at HIET referred a single patient to Dr.

Ravikumar after January 4, 2023.  Despite these facts and later claiming that the Hospital had no knowledge of the terms of the BSLMG termination letter, the MEC continued their "investigation."

48.     On January 8, 2023, Dr. Ravikumar met with Dr. Carter, who was now the Hospital's Chief Medical Officer, and Dr. Hudson, a cardiologist and the Vice Chief of Staff. Dr. Ravikumar showed them his STS results; both doctors agreed that Dr. Ravikumar's surgical results were very good.  During this meeting, Dr. Ravikumar also voiced his concerns about Dr. Huber and Dr. Bailey's continued involvement in the peer review investigation.

49.     Following this meeting, Dr. Ravikumar also spoke with Dr. Bachireddy about his concerns with Dr. Huber and Dr. Bailey. Dr. Bachireddy encouraged him to write a letter voicing his concerns to the MEC. Upon his suggestion, on January 9, 2023, Dr. Ravikumar sent another email to Dr. Kumar, the Chief of Staff, to voice his concerns with the makeup of the MEC and the potential bias of several of its members, namely Dr. Huber. Dr. Ravikumar also asked that Dr. Kumar forward the email to the entire MEC. Dr. Kumar never responded to Dr. Ravikumar's request.

### The Hospital Notifies Dr. Ravikumar about the MEC's Adverse Corrective Actions

50.     On February 27, 2023, CHI St. Luke's CEO, Monte Bostwick, sent a letter to Dr. Ravikumar stating the "ad-hoc committee" completed their peer review investigation. The letter also placed Dr. Ravikumar on notice that the Memorial Lufkin Medical Executive Committee ("MEC"), chaired by Dr. Preshant Kumar, made adverse recommendations concerning four of Dr. Ravikumar's patients, leading the Hospital to take "corrective action" with respect to Dr. Ravikumar's privileges.  The letter states:

The ad hoc committee investigation included, but was not limited to, reviewing the reports generated by the physician expert reviewers and the medical records of the four patients noted above and a consultation with a local cardiovascular surgeon.  It also completed an informal interview with you regarding these cases.  Based on its review, the ad hoc committee submitted a recommendation to the MEC which indicated it found a pattern of complications and issues in the surgical care of the four patients reviewed, with each patient's medical record having a lack of adequate documentation.

51.     Dr. Ravikumar never had an "informal interview" with an ad hoc committee. In fact, this was the first time Dr. Ravikumar learned that the MEC was investigating two more patients.

52.     The adverse actions included a one-day suspension of Dr. Ravikumar's privileges and membership until he completed certain Continuing Medical Education ("CME"). Dr. Ravikumar completed the CME before 24 hours expired.[14] The biggest issue, however, was the MEC's adverse recommendation regarding a pre-operative consultation requirement and concurrence with another cardiac surgeon.  The Hospital imposed this requirement on Dr. Ravikumar for a period of 10 cases or 90 days, whichever occurred later, which became effective upon the lifting of the one-day suspension:

> 3. Consultation requirement.  When the suspension of your clinical privileges has ended, the following restriction on your clinical privileges shall be in place for a period of ninety days or for ten (10) bypass cases, whichever occurs last:
>
> > Prior to scheduling and performing a bypass procedure, you must obtain a consultation from a board certified cardiovascular surgeon, which concurs with the planned surgical procedure.  Such consultation must be documented in the patient's electronic medical record.

---

[14] The MEC's first recommended corrective action required Dr. Ravikumar to complete medical education courses, which Dr. Ravikumar immediately completed, providing proof of completion to the Medical Staff Office on March 2, 2023. The hospital has since confirmed that the suspension on Dr. Ravikumar's clinical privileges was lifted as of March 2, 2023 when he provided written proof of completion of all required MECs.  Unfortunately, given the language of the MEC's second recommendation, Dr. Ravikumar will now have an obligation to self-disclose this one-day suspension when seeking new employment opportunities and applying for hospital privileges.

53.     This was an impossible requirement to fulfill, as Dr. Ravikumar had no job or patients.  He would also be in breach of his PSA with BSLMG if he tried to see any patients, pursuant to the January 4, 2023 termination letter. The Hospital decided to impose a summary suspension and a preoperative concurring consultation requirement on Dr. Ravikumar's then-useless privileges.  While Dr. Ravikumar's medical staff privileges were not set to expire until June 30, 2023, he was unable to see patients given the hospital's termination of his PSA and the terms of BSLMG's termination letter. He did not have a single patient at the Hospital, had not treated a patient in 55 days, and it was impossible for him to receive or admit a patient. There was no urgent necessity to suspend or restrict his privileges "to protect patient care." The Hospital had already forced him out of practice and he was not seeing any patients.  It would be impossible for Dr. Ravikumar to comply with the MEC's requirement that he obtain consultations "for a period of ninety (90) days or for ten (10) bypass cases, whichever occurs last." The Hospital was well aware of this situation. In fact, they had caused it.

54.     The MEC and the Hospital imposed these unsupported, discriminatory and wrongful corrective actions against Dr. Ravikumar without giving Dr. Ravikumar a hearing. In doing so, they violated their own CHI St. Luke's Health Memorial Lufkin Medical Staff Bylaws, Rules & Regulations ("Bylaws"). There were no grounds to dispense with a Hearing and impose these harsh sanctions prior to Hearing. St. Luke's Bylaws provide: "whenever his or her conduct may require that immediate action be taken *to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient*...." (emphasis added).  As the MEC knew very well, they had terminated Dr. Ravikumar 55 days previously, closed his clinic, and reassigned his staff. He had not seen a single patient in 55 days

and it was not possible for him to treat any patient for the past nearly 2 months. The adverse actions were not permitted by their own Bylaws.

### The "Fair" Hearing Process

55.     Dr. Ravikumar timely requested mediation and a hearing related to the MEC's imposition of the Consultation Requirement.  He disputed the MEC's basis for imposing the one-day suspension and Consultation Requirement on his privileges. Further, he communicated to the Hospital that such Consultation Requirement was impossible for him to complete. As worded, the MEC's recommendations did not afford Dr. Ravikumar an opportunity to make changes and improvements to his practice. Instead, they only served to trigger a number of "reportable" events for Dr. Ravikumar to the National Practitioner Data Bank and the Texas Medical Board.[15]

56.     To understand the rationale behind the MEC's recommendations, Dr. Ravikumar and his counsel immediately attempted to obtain copies of the hospital records and external review reports. Unfortunately, The Hospital and its counsel met these requests with numerous roadblocks. Violating their own Hospital Bylaws and fair hearing procedure, they refused to do the following:

a.     Disclose when the ad hoc committee allegedly completed its "informal interview" with Dr. Ravikumar;

b.     Disclose which medical staff members and/or administrators were involved in this "informal interview;"

c.     Disclose which case or cases (1-4) were discussed in this "informal interview;"

d.     Provide a copy of the interview summary pursuant to Section 8.2 of the Hospital Bylaws;

e.     Provide copies of the entire patient medical charts for all four patients, including radiology imaging and surgical informed consent records;

---

[15] This issue is discussed more fully in Plaintiff's Application for Preliminary Injunction and Memorandum in Support, which is incorporated by reference.

  f.  Provide a copy of any other materials the Hospital provided to the external reviewers;

  g.  Disclose the names and curriculum vitaes of the external reviewers;

  h.  Provide copies of any records, correspondence, or other materials sent or shown to the "local cardiovascular surgeon" mentioned on page 2 of Mr. Bostwick's February 27, 2023 letter;

  i.  Provide any reports authored by the "local cardiovascular surgeon" or any other medical provider who also participated in the investigation;

  j.  Disclose the names of the medical providers and staff members who participated in the investigation;

  k.  Provide the "Fair Hearing Plan Checklist" listed on page 100 of the Bylaws;

  l.  Provide any additional information that was provided to the external reviewers; and

  m.  Provide any evidence the MEC used to arrive at its adverse corrective actions.

57.  The Hospital never gave Dr. Ravikumar notice of when this alleged "ad hoc committee" supposedly ever "interviewed" him. Dr. Ravikumar did not even know the identity of the individuals involved in such committee or committees. The Hospital never gave Dr. Ravikumar appropriate written notice of the grounds upon which the MEC based their recommended actions.

58.  It was not until the evening of May 2, 2023, that the Hospital finally turned over the medical records and two external review companies' reports related to the four patients at issue. The medical records and the external reviews do not contain any evidence that Dr. Ravikumar was "absent" from the surgical OR for his patients. Unexplainably, the external reviewer for Cases 1 & 2 mentioned this in his expert report.

59.  The MEC and the Hospital made these recommendations despite the lack of evidence establishing that Dr. Ravikumar had violated any applicable standard of care, and despite

overwhelming evidence showing that Dr. Ravikumar was a conscientious surgeon whose care was consistent with all relevant standards. In preparing for mediation and the fair hearing, Dr. Ravikumar and his counsel uncovered several shocking truths about the MEC's investigation. The MEC ignored numerous crucial and salient facts and documents and withheld crucial facts and documents from the outside reviewers. The MEC also placed inordinate emphasis on recitations by interested parties.

60.     The MEC's actions were also not supported by the Hospital's own external reviewers. The imposition of the adverse actions with a preoperative concurring consultation addresses preoperative workup, patient selection, etc. prior to surgery. It is not related to intraoperative surgical skill or postoperative management of complications after surgery. The Hospital's own external reviewers found that all of Dr. Ravikumar's preoperative management met the standard of care. The restriction of obtaining another cardiothoracic surgeon's consult and agreement with the surgical plan prior to surgery is not related to anything but preoperative management. There is no allegation by the reviewers of any failure by Dr. Ravikumar to meet the standard of care in the preoperative setting. The MEC's adverse actions cannot be justified by the Hospital's external reviews. The preoperative concurring consult restriction only addresses preoperative concerns. The reviewers did not have concerns with Dr. Ravikumar's preoperative care. Such information cannot reasonably be relied upon to evaluate Dr. Ravikumar's surgical skill or judgment or to implement adverse recommendations.

61.     Mediation occurred on May 30, 2023, which was unsuccessful. Following mediation, the Hospital scheduled a "fair hearing" for September 20 and 21, 2023.

### *The Hospital Refused to Consider New Evidence Obtained by Dr. Ravikumar and Reconsider their Adverse Actions*

62.     On June 6, 2023, Dr. Ravikumar's counsel provided the following new evidence to

the Hospital's counsel and requested that the Hospital provide the new evidence to the MEC and

the hospital's external reviewers for their consideration:

| | |
|---|---|
| Exhibit 1: | Dr. Ravikumar's response to the external reviewer's report for patient #1 |
| Exhibit 2: | Dr. Ravikumar's response to the external reviewer's report for patient #2 |
| Exhibit 3: | Dr. Ravikumar's response to the external reviewer's report for patient #3 |
| Exhibit 4: | Dr. Ravikumar's response to the external reviewer's report for patient #4 |
| Exhibit 5: | Affidavit of Affidavit of Ramchander Chari, M.D. (re patient #'s 1 & 2) |
| Exhibit 6: | Affidavit of Janah Boyd (re patient #2) |
| Exhibit 7: | Affidavit of Robert Rodela Jr. (re patient #'s 1 & 2) |
| Exhibit 8: | Affidavit of Quinton Brent Slatter (re patient #1) |
| Exhibit 9: | Affidavit of Luis Reyes |
| Exhibit 10: | Letter from cardiothoracic surgeon, David Sees, M.D. (re patient #2) |
| Exhibit 11: | CV and expert report of Dr. Ravikumar's retained expert, J. Michael DiMaio, M.D. |
| Exhibit 12: | Missing Progress Notes not sent to the external reviewer for Patients #1 &2 |
| Exhibit 13: | Critical Care Unit Vital Sign Record for Patient #4 |
| Exhibit 14: | January 4, 2023 letter from Hospital terminating Dr. Ravikumar's Professional Services Agreement effective immediately |

63.     The evidence above showed that the medical records, the hospital's four external

reviews, and the one-page "Root Cause Analysis" document do not contain any evidence that Dr.

Ravikumar was "absent" from the surgical OR for his patients during an unsafe period of time.

The sworn affidavits from several of the OR Heart Team members (Dr. Chari, Ms. Boyd, Mr.

Rodela, Mr. Slatter, and Mr. Reyes) show that Dr. Ravikumar was appropriately present in the

surgical OR.

64.     The letter from a covering doctor, local cardiothoracic surgeon Dr. Sees, describes

the care he provided to the patient following surgery by Dr. Ravikumar. Dr. Sees states that the

patient appropriately had a pre induction intra-aortic balloon pump placed. His post procedure TEE

revealed improvement in his EF and no wall motion abnormalities to suggest ongoing ischemia.

Additionally, his EKG on postoperative day 1 did not reveal any acute ST-elevation and actually showed improved T-wave inversions in the anterior lateral leads. Dr. Sees opines that the patient's cardiogenic shock was likely secondary to myocardial stunning resulting from ongoing preoperative ischemia.

65.    The external reviewers failed to review key records located in the medical records. These notes show additional documentation, including key labs and cardiac indexes.  For patient #2, these records show key hemodynamics during the physical examination of the patient revealing that the patient was stable from a cardiac index standpoint. For patient #3, this documentation shows that Dr. Ravikumar ordered discontinuation of the femoral arterial line prior to transferring care over to Dr. Sees and Dr. Dewalt, who subsequently cared for the patient.

66.    Dr. Ravikumar was out-of-state during the period of time when the external reviewer criticizes the care provided to patient #3. Dr. Sees and Dr. DeWalt (not Dr. Ravikumar) were the surgeons involved in this patient's care. Regarding Dr. Ravikumar's care, the external reviewer for the hospital did not do a thorough review. The reviewer must not have seen Dr. DeWalt's operative note and assumed it was Dr. Ravikumar taking care of the patient.

67.    The external reviewer for patient #4 did not find any standard of care violations, except for documentation issues by the nurses. Regarding Dr. Ravikumar's care, the external reviewer for the hospital did not do a thorough chart review. The critical care unit vital sign record clearly documents what was happening in the OR and explains Dr. Ravikumar's actions.

68.    Dr. J. Michael DiMaio, a board-certified cardiothoracic surgeon with over 24 years of experience in cardiothoracic surgery, has reviewed the four sets of medical records, the hospital's "Root Cause Analysis" documentation, and the hospital's external reviewers' reports. He is of the opinion that Dr. Ravikumar met the standard of care for the four patient cases under

review. There is no evidence that he inappropriately left the OR during an unsafe period of time. There is no evidence he has violated a single hospital bylaw, policy, or procedure. There is no "pattern" of complications or issues in his surgical care.

69.     Dr. Ravikumar requested that the MEC consider this evidence and reconsider their recommendations in light of this information. The MEC refused to do so.

70.     On June 30, 2023, Dr. Ravikumar's underlying privileges and membership at the Hospital expired. He did not reapply for privileges since he had no job in Lufkin any longer.

71.     On July 12, 2023, counsel for Dr. Ravikumar sent correspondence to counsel for the Hospital stating that without privileges, there was absolutely no way for Dr. Ravikumar to comply with the MEC's pre-operative consultation requirement. The following request was made:

> Before everyone wastes valuable time, money, and resources in preparing for and participating in the September 20th fair hearing, we would request that the Hospital first provide the MEC and the external reviewers the new information and evidence listed above. The external reviewers and the MEC did not have the benefit of seeing this evidence before they made their initial recommendation. Without having an opportunity to review all of the records and evidence, their investigation was incomplete. We are concerned this may have led them to draw unreasonable, arbitrary or capricious conclusions. As such, we request that they reconsider their recommendations in light of this new information.

The MEC again refused to consider this new evidence.

72.     On September 18, 2023, Dr. Ravikumar elected not to move forward with the Hospital's hearing process.  Given the Hospital and the MEC's repeated refusals to review key medical records, affidavits, and expert witness reports from three of the most preeminent cardiothoracic surgeons in the country, Dr. Ravikumar did not believe that the Hospital's hearing process would provide him with any due process. As such, he decided to escalate his dispute of the Hospital's reports made to the National Practitioner Data Bank and defend his care before the Texas Medical Board. To this end, Dr. Ravikumar provided the Hospital with two additional expert

reports which he intended to utilize in escalating his NPDB dispute and with the Texas Medical Board.

73.     The first report is from Joseph S. Coselli, M.D., FACS, the Associate Chief of the Cardiovascular Service at Baylor St. Luke's Medical Center and St. Luke's Episcopal Hospital in Houston, Texas.  He is also the past-president of the American Association for Thoracic Surgery (AATS) and a Professor and Executive Vice Chair in the Department of Cardiothoracic Surgery and the Cullen Foundation Endowed Chair at the Baylor College of Medicine. Baylor St. Luke's Medical Center is the considered the preeminent hospital within the CHI St. Luke's system. Effectively, the Hospital MEC at Memorial Lufkin ignored their own Chief of Cardiothoracic Surgery's opinions and report.

74.     The second report is from Robbin Cohen, M.D., Professor of Cardiac Surgery at Cedars-Sinai Medical Center in Los Angeles and the Vice-Chair of the Standards and Ethics Committee for the Society of Thoracic Surgeons (STS) and a member of the STS Patient Safety Workforce. Both experts agreed with Dr. DiMaio, and opine that Dr. Ravikumar met the standard of care and have seen no evidence he violated Hospital bylaws, policies or procedures.  They have found the MEC's basis for imposing a summary suspension and pre-operative consultation requirement on Dr. Ravikumar's privileges to be unwarranted and unfairly punitive.

75.     It is worth noting that every external reviewer Dr. Ravikumar contacted and asked for an evaluation of his care and treatment for these four patients found that Dr. Ravikumar met the standard of care.  He sent the records to a fourth reviewer, Patrick Roughneen, M.D., who is also a member of the Standards and Ethics Committee with the Society of Cardiothoracic Surgery. He also came to the same conclusion that Dr. Ravikumar met the standard of care.  All four of

these experts are highly respected and qualified surgeons. Each independently found that Dr. Ravikumar did nothing wrong.

76.     Yet the Hospital felt that these experts' reports were not worth considering in making their decisions.   By refusing to consider this evidence, the Hospital MEC made unreasonable, arbitrary, and capricious conclusions affecting Dr. Ravikumar's professional license, livelihood and reputation.

***The Hospital Refused to Void the False Reports Made to the National Practitioner Data Bank (NPDB)***

77.     The Hospital also refused to rescind the reports it made to the NPDB in error.

78.     On June 7, 2023, the Hospital made its first false report to the NPDB, reporting concerns related to four surgical cases involving Dr. Ravikumar.  The documentation provided by the Hospital does not support the reasons for action. The Hospital's documentation includes medical records and two external reviews for a total of four cases. The Hospital's MEC does not have a CT Surgeon in its membership; as such, they relied upon the external reviews for their analysis and opinion. The documentation shows that Dr. Ravikumar was not involved in three of the four surgical cases at the time when the external reviewers raised concerns about patient care. Instead, other surgeons, and not Dr. Ravikumar, were involved in the care for which concerns were expressed. The Hospital wrongly reported the wrong doctor.

79.      The Hospital's adverse corrective action initial report was also filed long after the 30-day deadline to do so.  The Hospital imposed its adverse actions on Dr. Ravikumar without a hearing on February 27, 2023. It had been in effect for 30 days on March 29, 2023. The Initial Report was due at the Databank 30 days thereafter, which was on or before April 29, 2023. The Initial Report, DCN 5500000211156509, was not filed until June 7, 2023. On this date the report was 39 days past due.

80.     The Hospital then erroneously made a second report to the NPDB on July 24, 2023. The Second filing, DCN 5500000214046994 Date of Action 06.24.2023, was incorrectly filed as an "initial action" when it was a revision to the previous report. This second Clinical Privileges Action Processed on July 24, 2023, is clearly a revision to the Initial Report which refers back to the original action of Feb. 26, 2023. By filing another Initial Action report, the Hospital improperly added a separate action that wrongfully creates the impression that an independent adverse action was taken against Dr. Ravikumar. This is not correct and should be voided.

81.     On August 25, 2023, the Hospital filed a third report, DCN 5500000218327365 Date of Action 08.25.2023.  The Hospital mis-filed the third report as a Subsequent Action. There was no action taken by the Hospital whatsoever. There is no authority to file a report to the NPDB when a physician waives a Fair Hearing. This third report improperly and incorrectly clouds Dr. Ravikumar's record and should be voided.

82.     In early November, 2023, Dr. Ravikumar filed his Dispute Resolution Statement with the Secretary of the HRSA Dispute Resolution Department, providing a concise statement of disputed issues for determination by the Secretary of the HRSA, in connection with the NPDB reports.

83.     Dr. Ravikumar has requested that all three of the referenced DCNs be voided and that the Hospital be denied immunity under HCQIA of 1986 on the following grounds:

   a.   The Initial Action Report 5500000211156509 (Date of Action 02.23.2023) is erroneous because the action is not supported by the documentation. The Hospital reported the wrong physician (Dr. Ravikumar). Moreover, it was filed 39 days too late.

   b.   The second Initial Action report should not have been filed as an Initial Action because the subject of the report was only a development in the previous Action.

       c.      The third Subsequent Action is reporting on an event that was not an action of any kind.

84.     In the process of filing his dispute, Dr. Ravikumar learned that a fourth NPDB report had been filed by the Hospital in September of 2023.  Despite being months after terminating Dr. Ravikumar's employment and telling him that this matter is closed, the Hospital is continuing to make reports.  In addition to being false, this was another late filing in violation of the HCQIA rules and NPDB guidelines.

85.     The refusal by the Hospital to void false and erroneous reports and the string-reporting efforts by the Hospital show the malice and ill intent of the Defendants.  Under the NPDB guidelines, all these reports *should* have been made in one report.[16]  Multiple reports all related to one corrective action – which Dr. Ravikumar disputes was warranted in the first place – are causing

---

[16] The NPDB Guidebook provides the following guidance regarding multiple reports:

    Multiple Adverse Actions

If a single professional review action produces multiple clinical privileges actions (for example, a 12-month suspension followed by a 5-month mandatory consultation period requiring approval of a department chair before the exercise of clinical privileges), only one report, reflecting the multiple actions taken, should be submitted to the NPDB. The reporting entity may select up to five Adverse Action Classification Codes on the reporting format to describe the actions taken. Reporting entities should use the narrative description to explain any additional adverse actions imposed.

A Revision-to-Action Report must be submitted when each of the multiple actions is lifted or otherwise changed. For the example in the previous paragraph:

- If the Initial Report clearly states that the suspension is to end after 12 months, and the mandatory consultation period is to end after 5 months, and if these penalties are not changed and are fully met by the practitioner, no additional reports should be submitted.

- If, after the Initial Report is submitted, the suspension period is extended to 14 months or the mandatory consultation period is shortened to 4 months, a Revision-to-Action Report must be submitted when either change is imposed.

If an adverse action against the clinical privileges of a practitioner is based on multiple grounds, only a single report should be submitted to the NPDB. However, all reasons for the action should be reported and explained in the narrative description. The reporting entity may select up to four Basis for Action Codes to indicate these multiple reasons. Additional reasons should be summarized in the narrative description.

NPDB Guidebook, pages E-34 and E-35, available at  https://www.npdb.hrsa.gov/resources/NPDBGuidebook.pdf (last visited November 29, 2023).

ongoing injury to Dr. Ravikumar by falsely creating the impression that there are multiple corrective actions.  In addition to disparaging Dr. Ravikumar's name and reputation through these NPDB reports,[17] this false reporting is preventing Dr. Ravikumar from being able to obtain future employment.

### *The Hospital's Unlawful Discrimination*

86.     In addition to Defendants' unreasonable and wrongful investigation and failure to comply with HCQIA in connection with the entirety of its professional review action relating to Dr. Ravikumar, similarly situated Caucasian physicians were not treated in the same respect and with the same adverse "peer review" actions as Dr. Ravikumar, who is Indian.  On information and belief, there have been several Lufkin cardiothoracic surgery and cardiology cases performed by other physicians at the Hospital which resulted in complications and/or adverse outcomes that were never sent for outside review or deemed anything other than "managed appropriately." Further, such adverse patient outcomes did not result in peer review investigations or the loss of Professional Services Agreements or "on call" contracts for Caucasian physicians. As such, the criteria and standards applied when evaluating Dr. Ravikumar's care were not applied equally to the Caucasian cardiothoracic surgeons, who also happened to be his competitors.

## IV.     DEFENDANTS ARE NOT ENTITLED TO IMMUNITY UNDER "HCQIA"

87.     Immunity under the Health Care Quality Improvement Act ("HCQIA") only applies if a professional review action is taken:

a.      in the reasonable belief that the action was in the furtherance of quality health care,

b.      after a reasonable effort to obtain the facts of the matter,

---

[17] Although not available to the public in general, all hospitals and locum tenens agencies are able to view this information. Since these entities check the NPDB before hiring a physician, the matters are public knowledge to the entities that could hire Dr. Ravikumar.

      c.      after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

      d.      in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the notice and hearing requirements.

88.     Thus, Dr. Ravikumar must only establish that the professional review action was taken without satisfying any one of the foregoing criteria for Defendants to lose immunity for their participation in the professional review action against Dr. Ravikumar.  The evidence clearly shows that the actions taken against Dr. Ravikumar were not taken in the reasonable belief that the action was in furtherance of quality health care, but rather was a pretext for other wrongful and discriminatory actions.

89.     In addition, Defendants and the MEC did not make a reasonable effort to obtain the facts of the matter. They knowingly ignored additional evidence to arrive at their pre-determined adverse decision.  Defendants and the MEC knew their actions were not warranted by the facts.

90.     Further, immunity under HCQIA only applies to claims for money damages; it does not apply to Plaintiff's claims for injunctive or declaratory relief. HCQIA also specifically excludes civil rights claims from immunity, including those brought under 42 U.S.C. § 1981. Accordingly, Defendants are not entitled to immunity under HCQIA.

## V.     RESPONDEAT SUPERIOR / VICARIOUS LIABILITY / CIVIL CONSPIRACY / "CAT'S PAW"

91.     At all relevant times, Defendant Dr. Bailey, as Chief Medical Officer of Memorial Lufkin, Dr. Kaywin Carter, who later became Chief Medical Officer, and other agents of Memorial Lufkin working under its direction or on its behalf in furtherance of unlawful and improper actions, acted in furtherance of the business of Memorial Lufkin.  Memorial Lufkin is liable for the improper acts and omissions of its Chief Medical Officers, Dr. Bailey, and Dr. Carter, as well as

other agents of Memorial Lufkin, under the legal doctrines of respondeat superior, vicarious liability, and/or "cat's paw" theory of liability.

92.     Additionally, or in the alternative, Defendant Memorial Lufkin (acting by and through its agents/employees/principal officers) and other third parties acted together to carry out the improper and illegal actions, constituting civil conspiracy in carrying out their wrongful activities.

## VI.     CONDITIONS PRECEDENT

93.     All conditions precedent to Dr. Ravikumar's right to recover have been performed or have occurred.

## VII.     CAUSES OF ACTION

### COUNT ONE: BUSINESS DISPARAGEMENT AND CONSPIRACY TO COMMIT SAME

94.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

95.     Defendants published disparaging words about Dr. Ravikumar's professional competency. Such disparaging words included false claims about Dr. Ravikumar's performance as a cardiac surgeon and his professional competence outside the protections of any peer review committee, including statements by one or more representatives of Memorial Lufkin that Dr. Ravikumar was "having trouble with his privileges at the hospital and he will not be practicing here (Lufkin) much longer," and other highly inflammatory, false statements concerning Dr. Ravikumar.

96.     Defendants did and intended to harm Dr. Ravikumar's practice, economic and business interests.

97.     Defendants published these disparaging words with malice, without privilege, and knowing they were false, or with reckless disregard as to their truth or falsity. Defendants

published these disparaging words to Dr. Ravikumar's colleagues and peers in the Lufkin medical community.

98.     As a result of Defendants' disparagement, Plaintiff has suffered and will continue to suffer special economic damages, including but not limited to actual damages for lost profits and loss of past and future earnings. Plaintiff has also suffered damages for both past and future mental anguish and emotional distress as a result of Defendants' disparagement.

<u>COUNT TWO: TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE BUSINESS RELATIONS AND CONSPIRACY TO COMMIT SAME</u>

99.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

100.     Due to Defendants' wrongful and unlawful actions, Dr. Ravikumar has been shut out from the Professional Services Agreement ("on call" contract) he had with Lufkin.

101.     As of January 4, 2023, Dr. Ravikumar was excluded from the similar Professional Services Agreement for CT surgery call at the Hospital, resulting in lost compensation guaranteed by the contracts, as well as lost revenue from the cases he would have done while on call. Dr. Ravikumar has been refused a new contract at the Hospital while other CT surgeons have received new Professional Services Agreements in Lufkin.

102.     In addition, Dr. Ravikumar has had longstanding and continuous professional relationships with non-surgeon physicians in the community, and these relationships resulted in patient referrals for surgical procedures. As a result of Defendants' tortious and wrongful conduct, Dr. Ravikumar lost opportunities that he would have, in all reasonable probability, otherwise had, including but not limited to relationships with patients that he would have developed through providing on-call services, relationships with other doctors in the Lufkin area that would have served as patient referral sources for Dr. Ravikumar; and relationships with patients in the Lufkin

area that Dr. Ravikumar would have developed on his own through provision of the full scope of his surgical skills and exercise of his full privileges.

103.     Defendants engaged in independently tortious or unlawful acts, including but not limited to disparagement of Dr. Ravikumar.

104.     Defendants engaged in those independently tortious and unlawful acts with a conscious desire to prevent Dr. Ravikumar from developing both patient and referral doctor relationships or with knowledge that the interference was certain or substantially certain to occur as a result of their conduct.

105.     Defendants' unlawful conduct is also preventing Dr. Ravikumar from obtaining employment in the future.  Dr. Ravikumar is unable to get a new job while the false and publicly disparaging NPDB reports remain in place.

106.     As a result of Defendants' interference, Plaintiff has suffered and will continue to suffer actual damages including damages for lost profits, loss of past and future earnings and/or earning capacity.  In addition, Plaintiff has suffered damages for both past and future mental anguish and emotional distress.

<u>COUNT THREE: IMPROPER RESTRAINT OF TRADE</u>

107.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

108.     The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  Dr. Ravikumar therefore seeks relief under the laws established by the Sherman Act for Defendants' anti-competitive misconduct affecting the citizens residing in the Lufkin, Texas community.

109.     In the Lufkin, Texas community, Dr. Ravikumar was in competition with another Caucasian cardiothoracic surgeon, Dr. David Sees.  Defendants both derived illegal benefit, and

patient choice was improperly limited in the Lufkin, Texas community by the concerted effort of Defendants to restrain competition in and monopolize surgical procedures.

110.    In furtherance of the combination and conspiracy, and with the purpose and intent of excluding Dr. Ravikumar from the patient care market and destroying competition from Dr. Ravikumar, Defendants not only attempted to curtail or limit Dr. Ravikumar's surgical procedures, but also cast doubt upon and defamed Dr. Ravikumar's skill and qualifications as a surgeon in the Lufkin and East Texas communities during the pendency of the "peer review" and afterwards when Dr. Ravikumar tried to obtain other work. These acts were done with the specific intent to weaken or eliminate Dr. Ravikumar as a competitor, and because the market dominance that would result had a dangerous probability of success.

111.    Defendants' willful actions have also harmed and threatened the public by interfering with the orderly practice of medicine in the community, by reducing the number of surgeons actively practicing in cardiothoracic surgery in the community, and by depriving patients of the highest quality of medical care they would have been able to receive but for Defendants' concerted actions against Dr. Ravikumar.

112.    This concerted conduct was flagrant, willful, and accomplished for the specific purpose of harming Dr. Ravikumar, illegally and improperly taking Dr. Ravikumar's practice, and diverting it to his Caucasian competitor practicing at the Hospital.

113.    The acts of Defendants constitute illegal monopolization, attempted monopolization, and/or conspiracy to monopolize under applicable federal law.

<u>COUNT FOUR: DISCRIMINATION UNDER SECTION 1981</u>

114.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

115.    Defendants' discrimination against Dr. Ravikumar, who is Indian, is in violation of the rights of Plaintiff afforded him by 42 U.S.C. §1981.

116.    Defendants intentionally deprived Dr. Ravikumar of the same rights as are enjoyed by white citizens in the creation, performance, enjoyment, and all benefits and privileges of his contractual relationship with Memorial Lufkin, in violation of 42 U.S.C. §1981.

117.    As a result of Defendants' discrimination in violation of Section 1981, Dr. Ravikumar has been denied contractual rights and employment opportunities providing substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief. Dr. Ravikumar has also suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling him to compensatory damages.

118.    In their discriminatory actions as alleged above, Defendants have acted with malice or reckless indifference to the rights of Dr. Ravikumar, thereby entitling him to an award of punitive damages.

119.    To remedy the violations of the rights of Plaintiff, Plaintiff request that the Court award him the relief prayed for below.

<u>COUNT FIVE: BREACH OF CONTRACT</u>

120.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

121.    Dr. Ravikumar had a Professional Services Agreement with BSLMG, under which Dr. Ravikumar provided CT surgery on call services for Memorial Lufkin. Since January 4, 2023, Memorial Lufkin has wrongfully prevented Dr. Ravikumar from providing such services, in breach of the Professional Services Agreement, thereby causing damages.

122.    To the extent Defendants argue Dr. Ravikumar orally agreed not participate in the call roster while the peer review process was underway, such agreement was procured by duress, was intended to be of limited duration, and was executed on implied threat of summary suspension and immediate reporting to the National Practitioner's Database, which would cause further economic and professional harm to Dr. Ravikumar. Because Memorial Lufkin did not have the

contractual right to suspend his on call services pending the peer review process, such conduct amounts to breach of contract for which Plaintiff seeks damages.

<u>COUNT SIX: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

123.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201-2202, Plaintiff requests that the Court:

a.    Declare that the ad hoc committee investigation, peer review process and subsequent findings were malicious, discriminatory, and unjustified such that the adverse actions taken against Dr. Ravikumar, including the proctoring requirement, are null and void;

b.    Declare that the reports to the NPDB were not and are not required based on the unsupported and unlawful actions of Memorial Lufkin, or alternatively, declare that even if the proctoring requirement is valid, it does not constitute a reportable event under the NPDB's guidelines, or is at a minimum premature;

c.    Declare that Memorial Lufkin should not have sent reports to the NPDB and order Memorial Lufkin to submit Void Reports because the actions were not reportable because they did not meet NPDB reporting requirements;

d.    Issue an injunction to prohibit Memorial Lufkin from enforcing, following, relying on, or otherwise utilizing the adverse actions Memorial Lufkin has taken against Dr. Ravikumar; and/or

e.    Issue an injunction to prohibit Memorial Lufkin from reporting Dr. Ravikumar to the NPDB because the proctoring requirement is not a reportable event under the NPDB's guidelines.

f.    Issue an injunction requiring Lufkin Memorial to void any NPDB reports made on or about Dr. Ravikumar.

**VIII.   ATTORNEYS' FEES**

124.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

125.    Plaintiff would show that he is entitled to an award of attorney's fees and costs under Chapter 38 of the Texas Civil Practice & Remedies Code, as well as 42 U.S.C. § 1988.

Plaintiff has been required to hire attorneys and has incurred attorneys' fees in order to seek recovery against Defendants.

## IX.   PRAYER

126.   For these reasons, Plaintiff Dr. Ravikumar asks that Defendants be cited to appear and answer and that Plaintiff have judgment against Defendants for the following:

a.   Damages for lost profits;

b.   Damages for loss of past and future earnings;

c.   Damages for past and future mental anguish and emotional distress;

d.   Damages for humiliation, distress, inconvenience and loss of enjoyment of life;

e.   Punitive/exemplary damages;

f.   Attorney's fees and costs of court;

g.   Appropriate declaratory and injunctive relief, including:

i.   Declaring that the peer review process and subsequent findings were malicious, discriminatory, and unjustified such that the adverse actions taken against Dr. Ravikumar, including the proctoring requirement, are null and void;

ii.   Declaring that the four reports to the NPDB were not and are not required based on the unsupported and unlawful actions of Memorial Lufkin, or alternatively, declare that even if the proctoring requirement is valid, it does not constitute a reportable event under the NPDB's guidelines;

iii.   Declaring that Memorial Lufkin should not have sent reports to the NPDB and order Memorial Lufkin to submit Void Reports because the actions were not reportable because they did not meet NPDB reporting requirements;

iv.   Enjoining Memorial Lufkin from enforcing, following, relying on, or otherwise utilizing the adverse actions it has taken against Dr. Ravikumar, or alternatively, enjoining Defendant from reporting Dr.

Ravikumar to the NPDB because the proctoring requirement is not a reportable event under the NPDB's guidelines;

v.     Enjoining Defendant from reporting Dr. Ravikumar to the NPDB because the proctoring requirement is not a reportable event under the NPDB's guidelines; and/or

vi.     Issue an injunction requiring Lufkin Memorial to void any NPDB report made on or about Dr. Ravikumar.

h.     All other relief, in law and in equity, to which Plaintiff may be entitled.

Respectfully submitted,


By:     /s/ *Heather A. Kanny*
     HEATHER A. KANNY
     State Bar No. 24070031
     STEPHEN L. RISPOLI
     State Bar No. 24073456

**MAYER, LLP**
750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: 214/379-6900
Facsimile: 214/379-6939
Email:  hkanny@mayerllp.com
       srispoli@mayerllp.com

J. Mark Mann
MT2 Law Group
State Bar No. 12926150
112 East Line Street #304.
Tyler, Texas 75702.
mark@themannfirm.com

**ATTORNEYS FOR PLAINTIFF
RAMASWAMY RAVIKUMAR, M.D.**