IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| RAMASWAMY RAVIKUMAR, M.D., § § *Plaintiff,* § § v. § § MEMORIAL HEALTH SYSTEM OF § EAST TEXAS D/V/A CHI ST. LUKE'S § HEALTH MEMORIAL HOSPITAL § LUFKIN, et al, § § *Defendants.* | CAS NO. 2:23-CV-00560-JRG-RSP |

**REPORT AND RECOMENDATION**

Before the Court is the Plaintiff's Application for Preliminary Injunctive Relief. (Dkt. No. 2.) Plaintiff requests that the Court order the defendants to submit "void reports" to the National Practitioner's Database withdrawing the reports filed against Plaintiff and enjoin the defendants from submitting further such reports during the pendency of this litigation. (*Id.*)

After consideration, the Court recommends that Plaintiff's application be **DENIED** as provided below.

**I.    BACKGROUND**

Plaintiff, Ramaswamy Ravikumar, is a medical doctor specializing in cardiovascular and thoracic surgery.[1] Plaintff joined the medical staff at St. Luke's Health Memorial Hospital Lufkin ("the Hospital") in December of 2020. Plaintiff entered into a Professional Services Agreement with Baylor St. Luke's Medical Group ("the Group") providing a five-year term to expire December 2025, including a provision that Plaintiff could be terminated without cause upon 180 days written notice.

Central to this case are two tragic incidents from March, 2022. On March 28 and March 30,

---

[1] Defendants are Memorial health Systems of East Texas d/b/a CHI St. Lukes' Health Memorial Lufkin the "Hospital," Baylor St. Luke's Medical Group, CommonSpirit Health, Dr. David Bailey the prior Chief Medical Officer for the Hospital, Dr. Hunt Huber the previous Chief of Staff for the Hospital, Dr. Kaywin Carter the current Chief Medical Officer for the Hospital, and Dr. Prashant Kumar the current Chief of Staff for the Hospital.

Plaintiff performed significant multi-hour heart surgeries, but both patients subsequently died from complications. These deaths triggered peer review investigations under the Hospital's bylaws. While the Hospital's "Root Cause Analyses" identified several concerns, including the availability of certain equipment and common pharmaceuticals, Plaintiff's having left the OR while the patient was on cardiac bypass and driving off in his car raised significant concerns. However, the committee tasked with the investigation lacked expertise in the cardiovascular surgery Plaintiff performed and thus sought an external review.

While waiting for the external review, the Hospital had a "collegial intervention" wherein Plaintiff was requested, and agreed, not to leave the OR in such a manner again.

The external peer review reports came back on August 22, 2022 and the Hospital's Medical Executive Committee opened a formal investigation on September 20, 2022. Two additional subsequent cases were investigated before January 4, 2023, the date upon which the Group terminated the Professional Services Agreement relieving Plaintiff of his clinical and hospital duties.

On February 27, 2023, the peer review investigation was completed and it included corrective actions against Plaintiff. The corrective actions included a suspension of privileges until the completion of ten hours of continuing medical education, which was immediately completed the same day by Plaintiff, causing his privileges to be restored. However, the corrective actions further included a pre-operative consultation requirement and concurrence with another cardiac surgeon before Plaintiff would be permitted to perform any bypass surgery at the hospital. This latter corrective action was to continue for 10 cases or 90 days whichever concluded later.

The parties engaged in mediation on May 30, 2023, though no resolution was reached.

On June 6, 2023 Dr. Ravikumar, through counsel, provided evidence he believed would exonerate him. On June 7, 2023 the hospital submitted a report to the National Practitioners' Database ("the Database") noting the restriction placed upon Plaintiff's privileges.

On June 30, 2023, Plaintiff's privileges expired without Plaintiff seeing any patients or attempting to renew his privileges. On July 24, 2023, the hospital reported to the Database Plaintiff's non-

renewal of privileges while those privileges were restricted.

The parties were to engage in a "fair hearing" on the matter in September of 2023, but Plaintiff elected to not pursue the hearing process just before it was set to occur.

## II.  APPLICABLE LAW

An applicant is entitled to a preliminary injunction if he or she can show: (1) a substantial likelihood of success on the merits of the claim; (2) a substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) that the threatened injury to the applicant outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest. *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996). Issuance of a preliminary injunction is within the discretion of the Court. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Findings of fact are subject to a clearly erroneous standard of review, while conclusions of law are subject to a broad review. *Janvey v. Alguire*, 647 F.3d 585, 591–92 (5th. Cir. 2011).

## III.  ANALYSIS
### A.  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

As this Court previously held, "[t]o demonstrate a likelihood of success on the merits, [Plaintiff] must demonstrate that the Hospitals' adverse report to the NPDB was likely improper under the governing statutes and guidelines." *Walker v. Mem'l Health Sys. Of E. Tex.*, 231 F.Supp.3d 210, 215 (E.D. Tex. 2017).

Plaintiff argues the adverse reports to the Database were improper because the corrective action the hospital imposed was itself improper. Plaintiff explains that the corrective action was improper for three reasons[2], first, the hospital incorrectly concluded that Plaintiff had breached the standard of care, second, the corrective action was unnecessary and had no relation to the alleged breach, and third, the corrective action was improper under the Hospital's bylaws.

### I.  STANDARD OF CARE

On the first issue, the Hospital concluded that Plaintiff breached the standard of care by leaving

---

[2] In his briefing Plaintiff made mention of racial discrimination but during the Hearing, Plaintiff largely did not explore this with any witnesses and indeed on the current record, the Court can find no racial discrimination.

the OR during the operation and driving in his car during cases 1 and 2[3]. Defendants presented testimony that Plaintiff left not just the OR but the hospital itself while the patient was on cardiac bypass and drove around the hospital parking lot. This raised the concern of not just the peer review committee but also the external reviewers, who found a breach.

Plaintiff testified that he did not dispute having left the hospital and driven in the parking lot while having a patient in the OR on a cardiac bypass machine. However, he testified that this was only done during a "safe time" and never an "unsafe time." He explained that during the time he left the building, the cardiac bypass machine was being used to allow the heart to rest and the patient was "closed up" and in recovery. He further testified that he got in his car to drive because it was the fastest route to his office, since he could not walk very quickly on account of a prior ankle injury and that he would still be able to quickly respond to any emergency that might arise.

In support of his argument that he only left during a "safe time," Plaintiff provided affidavits of several members of his OR team that leaving the OR was common. Further, Plaintiff points to the American College of Surgeons' guidelines that provide: "A primary attending surgeon may have to leave the operating room for a procedure-related task, such as review of pertinent pathology ('frozen section') and diagnostic imaging, discussion with the patient's family, and breaks during long procedures. The surgeon must be immediately available for recall during such absences." (*See* Dkt. No. 12-17 at 4)

Plaintiff further testified that he left the OR only in furtherance of patient safety, attempting to address pharmaceutical and equipment issues as well as updating the family.

The Court likewise heard testimony on other issues that ultimately contributed to the tragedy of cases 1 and 2. First, Dr. Bailey testified to an issue with getting Nipride, an apparently common heart medication, from the hospital pharmacy. Second, was the issue of obtaining an ECMO machine. Plaintiff notes that he had requested the hospital acquire such a device because it increased patient safety in many instances and he believed one would be important for these cases.[4]

---

[3] While cases 3 and 4 were discussed, the parties both focused on cases 1 ad 2.
[4] At the hearing, the parties provided very little testimony on this issue and did not materially address the importance

Plaintiff contends he was calling other hospitals and attempting to secure both Nipride and an ECMO machine when he left the OR, and he places the blame for not having both on the hospital.

However, Drs. Bailey and Kumar testified that no one knew what Plaintiff was doing when he left the hospital and Defendants placed the blame on him for having accepted such high-risk patients knowing the hospital's shortcomings.

Additionally, two experts, Dr. Coselli and Dr. Roughneen, testified on behalf of Plaintiff via deposition. Dr. Coselli testified that he found it "problematic" that Plaintiff would leave the building while the patient was still on cardiopulmonary bypass. (Coselli Deposition 96:12-19, *see also id*. at 28:19-29:10, 83:22-84:8, 92:4-96:19, 102:9-24, 129:21-132:9.) Dr. Coselli also criticized the overall sufficiency of the Hospital's external reviews. (*See id*. at 32:2-33:1.) Dr. Roughneen was less critical of Plaintiff's leaving the Hospital and testified that "it was appropriate for Dr. Ravikumar to take a break. I think that it is appropriate for him to be available by the fastest means, which, in this case, was by car." (Roughneen Depo 72:5-17.) However, Dr. Roughneen did concede that the "optics of it are not good." (*Id*. at 107:21-108:1.)

The Court does not find that, on this record, Plaintiff has shown a substantial likelihood of success on the merits that the hospital incorrectly found he had breached the standard of care in cases 1 and 2. The Court is not convinced that Plaintiff's leaving the hospital when he did was not a breach of the standard of care. While the American College of Surgeons provides that a surgeon may leave the OR under some circumstances, Plaintiff has not shown that such was the case here. Indeed, one of Plaintiff's experts testified that it is not the case and the other expert testified that it was sufficiently close that he understood why it looked bad. Furthermore, it is not clear to the Court what the condition of the patients actually was when Plaintiff left the OR, or even if Plaintiff is correct that a patient's recovery on bypass is a "Safe Time."[5]

---

of such a device for either case 1 or 2.
[5] While, Cases 3 and 4 address different concerns, and in one case the external reviewer found Plaintiff did not breach the standard of care, the Court finds they do not materially alter the Court's finding. Even if the Court found no breach in Cases 3 and 4, the Court would not recommend requiring a void report since cases 1 and 2 still support

5

## II. NECESITY OF CORRECTIVE ACTION

Second, Plaintiff argues that even if Plaintiff did breach the standard of care by leaving the OR, the subsequent corrective actions were baseless because they would not address the complained of behavior and their concerns were already resolved by the collegial intervention.

Plaintiff argues that if the real concern was his leaving the OR during an operation, then pre-operative consultation requirements are simply extraneous and are not supported by patient safety concerns. Without such concerns, the requirement is simply malicious.

Further, Plaintiff argues any concern was addressed by the collegial intervention. At the hearing, several members of the MEC and Plaintiff himself testified that several members of Hospital staff, together, spoke with Plaintiff about his leaving the OR and requested he not do so in the future, to which he agreed. Thus, Plaintiff argues there was no further concern as to his leaving the OR in future.

Defendants counter that the requirement is that "prior to scheduling and performing a bypass procedure, [Plaintiff] must obtain a consultation from a board certified cardiovascular surgeon, which concurs with the planned surgical procedure." Defendants contend this is broader than just reviewing pre-operative workup and covers the entire surgical case. Further, Defendants point out that the requirement is limited only to bypass procedures, the kind that raised the Hospital's concern. Further, Defendants argue that while Plaintiff has agreed not to repeat the concerning behavior, they cannot watch over Plaintiff to ensure such.

The Court is likewise unconvinced that this sufficiently demonstrates the reports were improper. The Defendants credibly articulated a rationale for the restrictions that is clearly more than mere malice. Plaintiff's explanations to the contrary do not demonstrate malice or otherwise that the restrictions were not tailored to further patient safety.

## III. BYLAWS

Last, Plaintiff argues the corrective actions were improper because Plaintiff could not, at the time

---

the filing and thus the alleged irreparable harm would remain.

they were imposed, see patients. Thus, there was no threat to patient safety to justify the action. Plaintiff contends this violates the hospital's own bylaws[6]. The bylaws provide "whenever his or her conduct may require that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee, or other person present … [the Hospital] shall have the authority to summarily suspend the membership status of all or any portion of the clinical privileges of such Member." (Dkt. No. 12-21.)

Plaintiff contends he was fired from the hospital and had only "useless privileges" at the Hospital prior to their being restricted. Plaintiff contends the effect of his firing was to render him unable to see any patients, and indeed he did not. Thus, Plaintiff contends there was no basis for the hospital to believe there was any immediate need to protect the life or safety of any patients.

Defendants disagree and contend the termination of the Professional Services Agreement only relieved Plaintiff of his clinical duties, but he could have still used his privileges to see patients of his own. Thus, but for their action, Plaintiff could have opened his own practice or requested to be placed on call or otherwise have performed surgery at the hospital.

The Court agrees with Defendants. It is not clear to the Court that Plaintiff was not able to see patients. Indeed a significant thrust of Plaintiff's complaint is his immense skill and groundbreaking work in his field. In light of this, Plaintiff has not presented adequate argument or evidence that he could not have otherwise utilized his privileges.

Likewise, the Court finds the requirement for a notice and hearing under §11112(a)(3) prior to "a professional review action" was not violated on this record. In particular, §11112(c)(2) abrogates that requirement under circumstances similar to the bylaws.

---

[6] At the hearing, mention was made of a provision in the HCQIA to the same effect. 42 U.S. C. §11112(a) provides "a professional review action must be taken (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable efforts to obtain facts and after meeting the requirement of paragraph (3)." 42 U.S.C. §11112(c)(2) provides "for purposes of section 11111(a) of this title, nothing in this section shall be construed as (2) precluding an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual."

## IV. MALICE

While the Court finds Plaintiff has not demonstrated a substantial likelihood of success on the merits, Defendants argued that Tex. Occ. Code §160.010 provides "[a] cause of action does not accrue against a member, agent, or employee of a medical peer review committee or against a health care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of medial peer review." Defendants contend that at the very least, they did not act with malice and Plaintiff made no showing of such.

Plaintiff contends the malice is shown by Defendants' restricting his privileges in a manner that was reportable, after his privileges were useless, and choosing to file the first report the day after he provided exculpating evidence.

As these arguments mirror those Plaintiff makes to demonstrate he is likely to succeed on the merits, which the Court has found insufficiently availing on this record, they do not support finding malice here. Further, while the timing of the first report does raise questions, that was all that was demonstrated on this record and no underlying malice was shown.

### B. IRREPERABLE HARM

As in *Walker,* the Court finds "[a]n adverse report on the NPDB … is intrinsically harmful to that surgeon's practice, professional reputation and livelihood." F.Supp.3d at 216. At the Hearing, Plaintiff testified that he had been unable to find other surgical work and was advised by a *Locums* agency to avoid applying for additional privileges as they would likely be denied on account of the reports, resulting in further reporting. This amounts to irreparable harm caused by the NPDB reports.

However, Plaintiff did not present evidence at the hearing of separate harm caused by the additional reports, i.e. that Plaintiff's harm might be lessened by ordering the Hospital to file void reports as to only some reports or that corrections that did not entirely eliminate the report might alleviate the harm. As such, where the Court finds that at least two of the reports are supportable, the Court need not examine other portions or subsequent reports.

### C. BALANCE OF HARMS

The Court finds the balance of harms weighs in favor of Plaintiff. His harm is significant reputational and livelihood harm while it appears the only burden to the Hospital is to simply make a filing.

### D. PUBLIC INTEREST

Unlike in *Walker*, the Court is not convinced that a preliminary injunction would not disserve the public's interest. There, it was a question as to the length of the corrective action, so the Court based its finding on Congress's choice to limit reportability of such events by their length. The same is not true here.

Rather here, the public has an interest in identifying physicians whose practice has been professionally questioned. Since the Court does not find Plaintiff has a substantial likelihood of success in showing he did not breach the standard of care, the Court similarly finds that the public has an interest in knowing about it.

## IV. CONCLUSION

The Court recommends that the Plaintiff's Application for a Preliminary Injunction be **DENIED**.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. FED. R. CIV. P. 72(b)(2); *see also Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (*en banc*). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendation [cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 10th day of June, 2024.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE